# Arnold & Porter

**Kent A. Yalowitz**
+1 212.836.8344 Direct
Kent.Yalowitz@arnoldporter.com

July 3, 2019

Hon. Analisa Torres
United States District Court
  for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

      Re:    *Casa Express Corp. v. Bolivarian Republic of Venezuela,*
               No. 18 Civ. 11940 (AT)

               *Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela,*
               No. 19 Civ. 3123 (AT)

Dear Judge Torres:

      I write on behalf of the Bolivarian Republic of Venezuela ("Republic") to explain why the Court should decide the Republic's anticipated motion first—before the Court and the Republic are required to devote resources to addressing these cases.

      As the Court is aware, on January 10, 2019, the freely and fairly elected Venezuelan National Assembly determined, in accordance with the Venezuelan constitution, that the presidency was vacant because Nicolás Maduro had claimed victory in a fraudulent election. On January 23, National Assembly President Juan Guaidó, supported by the democratically elected National Assembly, assumed the interim Presidency of Venezuela in an effort to restore democracy and constitutional rule. The United States immediately recognized Mr. Guaidó as the legitimate interim President of Venezuela.[1]

      The Interim Government deplores the systematic destruction of the Venezuelan economy, including through nationalizations, expropriations, and over-indebtedness that stained the reputation of the Chavez and Maduro regimes. It shall be the policy of the Interim Government to seek a fair settlement of all legacy claims against the Republic and public sector entities as promptly as possible in the circumstances. To that end, the Republic plans to engage in an orderly, consensual debt restructuring in which all similarly situated commercial claims will be treated equally.

      But the first order of business must be to preserve assets with which to address the complex and unprecedented humanitarian emergency. Allowing claims by bondholders to proceed at this juncture puts at risk assets that will be required for humanitarian relief and to restore the Venezuelan oil industry. Equally important, even the adjudication of such claims will require the Republic to expend resources to protect those assets—

---

[1] *See* Dept. of State, U.S. Government Support for the Democratic Aspirations of the Venezuelan People, https://www.state.gov/u-s-government-support-for-the-democratic-aspirations-of-the-venezuelan-people/#crisis ["U.S. Government Support"].

# Arnold & Porter

Hon. Analisa Torres
July 3, 2019
Page 2

resources that, again, could be used for humanitarian purposes.[2]  Venezuela has a further concern.  The entry of judgments will precipitate additional suits, in which some claimants attempt to obtain competitive advantages over similarly situated claimants.  A deluge of litigation would magnify the scope and gravity of the matters requiring the Republic's attention, threaten to extend and deepen the humanitarian crisis, and delay the Republic's economic recovery.  A stay would alleviate this concern and contribute to the Republic's goal of preserving assets for humanitarian relief.

I.   **The humanitarian emergency and unparalleled economic collapse**

Venezuela is facing an economic and social crisis far graver than any other macro-economic crisis that has resulted in the non-payment of public sector obligations (for example, the Argentina crisis of 2001).  As Dr. Ricardo Hausmann of Harvard has written, the current situation in Venezuela is "the biggest economic collapse in human history outside of war or state collapse."[3]  Venezuela's gross domestic product has fallen nearly 50% in the last five years—much more than during the Great Depression.[4]  According to the United Nations High Commissioner for Human Rights (UNHCHR), more than 4 million people have fled Venezuela "[a]s a direct result of this far-reaching human rights crisis."[5]  For those remaining, life is grim.  The U.S. State Department reports that nearly 9 out of 10 Venezuelans live in poverty and 90% of families report not being able to buy enough food.[6]  Many lack access to clean water.[7]  Eight out of ten households lack a reliable source of food.[8]  Eighty percent can no longer afford basic healthcare.[9]  Nearly

---

[2]  If a stay is not granted, the Republic will need to expend its resources on discovery in order to assure itself of the validity of plaintiffs' claims by obtaining evidence of plaintiffs' standing through actual ownership of the bonds sued on; evidence that the plaintiffs actually purchased the *claims* sued on (*see* GOL 13-107); and evidence that the plaintiffs are not persons against whom the Republic has a right of set-off.  These are standard inquiries required of a prudent governmental defendant that may be addressed in most cases with targeted and efficient discovery.

[3]  Ricardo Hausmann, Director of the Center for International Development, Harvard University *Understanding Venezuela's collapse,* The Harvard Gazette (Feb. 12, 2019)*:* https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/ ("Hausmann Statement")

[4]  *Id.*

[5]  UNHCR Michelle Bachelet, *Oral Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela* (Mar. 20, 2019), https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=24374 ["UNHCHR Oral Statement"]; UNHCR, *Refugees and migrants from Venezuela top 4 million: UNHCR and IOM* (Jun., 07, 2019), https://www.unhcr.org/news/press/2019/6/5cfa2a4a4/refugees-migrants-venezuela-top-4-million-unhcr-iom.html

[6]  U.S. State Dept., U.S. Government Support.

[7]  United States Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #2 at 5 (April 10, 2019), https://www.usaid.gov/sites/default/files/documents/1866/04.10.19_-_USG_Venezuela_Regional_Crisis_Fact_Sheet_2.pdf. ["USAID Fact Sheet #2"].

[8]  Human Rights Watch, *Venezuela's Humanitarian Emergency* 26 (April 2019), https://www.hrw.org/sites/default/files/report_pdf/venezuela0419_web.pdf.  ["HRW Report"].

# Arnold & Porter

Hon. Analisa Torres
July 3, 2019
Page 3

70% of Venezuela's hospitals report intermittent power outages and a lack of potable water.[10]  Venezuela now experiences routine outbreaks of vaccine-preventable diseases that had previously been eradicated.[11]  More than one million children no longer attend school.[12]  The crisis has been further exacerbated by rolling blackouts.[13]

The humanitarian emergency is closely intertwined with Venezuela's current lack of foreign currency.  Almost all of Venezuela's debt was incurred at a time when robust production from Venezuela's vast oil and gas reserves provided the nation with hard currency to import food, medicine and other products and to repay debt incurred in the ordinary course.  But during the Chavez and Maduro regimes, expropriations, corruption, and kleptocracy destroyed infrastructure and domestic production capacity.  Today, the Venezuelan people cannot meet their own needs through local production.  Imports represent the only immediate source of food, medical equipment and medicine.  The collapse of the oil industry, along with the looting of public resources by the Maduro regime, has left Venezuela without any means to pay for these essential, life-preserving imports.  Total imports have collapsed by almost 70% amidst hyperinflation.  As a result,  the purchasing power of the minimum wage is vanishing:  since 2016, this power is well below the family baseline of 10,000 calories per day.[14]  And shortages of food, medicine, and other essential products and services grow worse every day.

## II.     The benefit to the Republic from a stay

In this time of crisis, spending resources on the defense of debt collection actions, not to mention judgments in foreign currency, directly and adversely impacts the Interim Government's ability to address this complex humanitarian emergency.  Every dollar used to defend against claims of foreign creditors and to pay foreign creditors is a dollar that is no longer available to buy food and medicine to alleviate the humanitarian crisis.

Lawsuits at this time consume scarce governmental resources that should be allocated to more-pressing matters.  They also threaten strategic assets of the Republic, which will be crucial to begin the path to economic recovery.[15]

---

[9]  U.S. Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #1, at 5 (March 1, 2019),  https://www.usaid.gov/sites/default/files/documents/1866/venezuela_regional_crisis_fs01_03-01-2019.pdf.  ["USAID Fact Sheet #1"].

[10]  *Id.*

[11]  *Id.* at 20.

[12]  UNHCHR Oral Statement.

[13]  USAID Fact Sheet #2 at 5.

[14]  *See* Bahar, Dany et al., *Impact of the 2017 sanctions on Venezuela: Revisiting evidence, Global Economy and Development at Brookings* 6-9 (2019).

[15]  *See, e.g.*, *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, No. 17-mc-151 (D. Del. Aug. 23, 2018), Dkt. No. 95 (ordering issuance of writ of attachment *fieri facias* to attach shares of holding

**Arnold & Porter**

Hon. Analisa Torres
July 3, 2019
Page 4

A temporary pause will also enable the nascent Guaidó administration to devote its scarce human resources to engagement with the International Monetary Fund ("IMF") and other official sector actors to begin to develop a long-term economic recovery plan and to organize itself for an orderly and consensual restructuring of its debts.

### III. The benefit to all creditors from a stay

As part of the process of rebuilding Venezuela's economy, the Republic will need to respond to all claims and come to terms with all its creditors. It will be the policy of the Interim Government to seek a fair and orderly settlement of all reconciled claims against the Republic and its public sector entities as promptly as possible.

The National Assembly and Interim President Juan Guaidó, together with their professional advisors, are in the process of formulating a comprehensive plan to restructure all the claims against the Republic and its state-owned enterprises. The first order of business must be to address the humanitarian emergency. Then, attention will shift to an economic stabilization plan. Only through the stabilization and ultimate recovery of the Venezuelan economy will the Republic be in a position to address creditors' claims. Ultimately, the Government envisions a restructuring plan based on four main principles: (i) the restructuring process will be based on a comprehensive approach to all the claims against the Venezuelan public sector; (ii) only reconciled claims will be eligible to participate in the restructuring; (iii) once reconciled, all the claims will be treated on equal terms; and (iv) the Interim Guaidó administration will request the assistance of the IMF and other official sector actors in addressing the dire humanitarian crisis in Venezuela and in developing a longer-term program for the country's economic recovery.

In any restructuring, an orderly process benefits all creditors' expectations of equal treatment by preventing a chaotic and uncontrolled scramble for a debtor's assets.[16] It is thus in the best interests of the creditor group as a whole to have a temporary pause in proceedings which will give such a process the best chance of success.[17]

This Court has granted such relief in cases involving the restructuring of sovereign debt in countries in which the economic crisis was nowhere as severe as the unparalleled economic collapse in Venezuela. In *Pravin Banker Associates, Ltd. v. Banco Popu-*

---

company that owns CITGO Petroleum, which has refineries with the capacity to process heavy crude oil from Venezuela).

[16] *See In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992); *Hunt v. Bankers Tr. Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986).

[17] Plaintiffs point out that certain secured debt has been kept current, which has included a recent interest payment. This debt, issued by PDVSA and secured by shares of an indirect parent of Citgo, is unique in that it is secured debt, which *always* receives different treatment from unsecured debt. The decision to make the particular payment in order to avert a potential foreclosure crisis, was approved by the National Assembly in light of the unique circumstances of that debt.

**Arnold & Porter**

Hon. Analisa Torres
July 3, 2019
Page 5

*lar del Peru*, the Court found that it was appropriate and consistent with U.S. policy interests to stay litigation against Banco Popular, a state-owned bank in Peru, to provide Peru time to implement economic adjustment initiatives under the IMF's guidelines.[18]

A stay of proceedings here would also comport with the United States' longstanding policy of encouraging the orderly and consensual resolution of sovereign debt issues. As the U.S. Government has said in other such cases:

> "The policy of the United States with respect to private debt … places great weight upon the voluntary participation of private lenders in the debt restructuring process. This is one element of an overall policy designed to facilitate the orderly resolution of the difficult debt service problems faced by a considerable number of developing countries. Such orderly resolution is crucial to the stability and future growth of the world and the U.S. economy."[19]

> "In those rare cases where a sovereign cannot meet its external obligations … the policy of the United States is that the orderly and consensual restructuring of sovereign debt, in conjunction with needed macroeconomic adjustments, is the most appropriate response."[20]

The humanitarian crisis exacerbates these concerns, for reasons the U.S. Government described in a case involving Brazilian debt:

> Given the emergence of a rapidly growing secondary market in sovereign debt, the United States is also concerned that this lawsuit could unduly encourage other commercial creditors to try to extract through litigation concessions from sovereign debtors that they were not able to obtain through good faith negotiations.[21]

\*   \*   \*

For the foregoing reasons, the Republic respectfully requests that the Court resolve the Republic's anticipated motion before scheduling other proceedings.

---

[18] *Pravin Banker Assocs. v. Banco Popular del Peru*, 165 B.R. 379, 389 (S.D.N.Y. 1994).

[19] Statement of Interest of the United States at 4, *Allied Bank Int'l v. Banco Credito Agricola del Cartago*, No. 83-7714 (2d Cir. July 1984).

[20] Brief for the United States, *NML Capital Ltd. v. Republic of Argentina*, 2012 WL 1150791, at *7 (2d Cir. Apr. 4, 2012).

[21] Statement of Interest of the United States at 17, *CIBC Bank & Trust Co. v. Banco Central do Brasil*, 94 Civ. 4733 (LAP) (Sept. 8, 1994).

# Arnold & Porter

Hon. Analisa Torres
July 3, 2019
Page 6

                                                  Respectfully submitted,

                                                  Kent A. Yalowitz
                                                  Whitney Debevoise

cc:   ECF Counsel