UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASA EXPRESS CORP,

                    Plaintiff,

     v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

                    Defendant.

  PHARO GAIA FUND LTD., *et al.*,

                    Plaintiffs,

v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

                    Defendant.

Case Nos.  18-cv-11940 (AT)
                19-cv-3123 (AT)

**REPLY MEMORANDUM OF THE BOLIVARIAN REPUBLIC OF VENEZUELA
IN SUPPORT OF CROSS-MOTION FOR A STAY**

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689

*Attorneys for the Bolivarian Republic of
Venezuela*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.  The Court Should Not Enter A Judgment For The Pharo Plaintiffs Unless and
    Until They Produce An OFAC License ........................................................... 2

II. The Court Should Stay These Cases ............................................................... 7

    A.  This Court Should Exercise Its Inherent Power to Stay These Cases ............ 8

    B.  The Court Should Stay These Cases In The Interest Of International Comity. .... 12

        1.  Abstention Based On International Comity Is Appropriate .................... 12

        2.  A Stay Is Justified Under The Doctrine Of Necessity ........................... 14

        3.  The Republic Is Unable To Access Resources Necessary To
            Perform Or Settle Its Financial Obligations At This Time. ................ 17

    CONCLUSION .................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**                                                                                     Page(s)

*Allied Bank Int'l v. Banco Credito Agricola*,
    757 F.2d 516 (2d Cir. 1985) ................................................................. 12, 13, 14

*In re Assicurazioni Generali, S.P.P.*,
    592 F.3d 113 (2d Cir. 2010) ...................................................................7

*Canada S. Ry. Co. v. Gebhard*,
    109 U.S. 527 (1883) ...........................................................................13

*In re Colonial Realty Co.*,
    980 F.2d 125 (2d Cir. 1992) ...................................................................9

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
    No. 15 Civ. 1082, 2019 WL 6785504 (D. Del. Dec. 12, 2019)........................... 9, 10, 11, 12

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ...........................................................................4

*Dresser-Rand Co. v. Petroleos de Venez., S.A.*,
    No. 19 Civ. 2689 (S.D.N.Y. Feb. 11, 2020), ECF No. 59................................3, 7

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
    No. 13 Civ. 1450 (HB), 2013 WL 4414875 (S.D.N.Y. Aug. 19, 2013) .................................3

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ...........................................................................15

*NML Capital, Ltd. v. Republic of Arg.*,
    No. 11 Civ. 4908 (TPG), 2015 WL 3542535 (S.D.N.Y. June 5, 2015)...................................3

*In re Nw. Airlines Corp.*,
    483 F.3d 160 (2d Cir. 2007) ...................................................................7

*The Paquete Habana*,
    175 U.S. 677 (1900) ...........................................................................15

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
    165 B.R. 379 (S.D.N.Y. 1994)................................................................ 7, 12, 13

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
    1995 WL 102840 (S.D.N.Y. Mar. 8, 1995)......................................................8

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
    109 F.3d 850 (2d Cir. 1997) ...................................................................12

*Stephens v. Nat'l Distillers & Chem. Corp.*,
  69 F.3d 1226 (2d Cir. 1995) ............................................................15

*Westinghouse Credit Corp. v. D'Urso*,
  371 F.3d 96 (2d Cir. 2004) ...............................................................3

*Whiteman v. Dorotheum GmbH*,
  431 F.3d 57 (2d Cir. 2005) ...............................................................7

**Statutes and Regulations**

11 U.S.C. § 362 ....................................................................................7

28 U.S.C. § 1610(c) ...........................................................................10

50 U.S.C.
  § 1701 note .......................................................................................4
  § 1702(a)(1)(B) ...............................................................................4

Venezuela Defense of Human Rights and Civil Society Act of 2014,
  Pub. L. 113-278, 128 Stat. 3011 ......................................................4

31 C.F.R.
  § 591.201 ..........................................................................................6
  § 591.202(a) ......................................................................................5
  § 591.309 ..........................................................................................5
  § 591.310 .......................................................................................5, 6
  § 591.407 ..........................................................................................6
  § 591.506(c) ......................................................................................6

Exec. Order No. 13692,
  80 Fed. Reg. 12,747 (Mar. 8, 2015) ...............................................12

Exec. Order No. 13808,
  82 Fed. Reg. 41,155 (Aug. 24, 2017) ...............................................4

Exec. Order No. 13884,
  84 Fed. Reg. 38,843 (Aug. 7, 2019) ...........................................4, 12

**Other Authorities**

Congressional Research Service, *Sovereign Debt in Advanced Economies:*
  *Overview and Issues for Congress* 14 n.37 (Oct. 28, 2013)
  (https://fas.org/sgp/crs/misc/R41838.pdf) .......................................2

*Cont. Cas. Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168
  (Sept. 5, 2008) .................................................................................15

Mitu Gulati, *Do Judgements Trump CACs?*, Credit Slips (Feb. 10, 2020, 12:58 PM) (https://www.creditslips.org/creditslips/2020/02/do-judgements-trump-cacs.html) ............................................................................................................3

Int'l Monetary Fund, *Collective Action Clauses in Sovereign Bond Contracts—Encouraging Greater Use* (June 6, 2002) (https://www.imf.org/external/np/psi/2002/eng/060602a.pdf) ................................2

Ralph Janik, *International Responsibility*, in *International Law in Domestic Courts: A Casebook* 387, 428 (Andre Nollkaempe *et al.*, eds., 2019) ...................................16

Roberto Ago (Special Rapporteur), *Addendum to the Eighth Report on State Responsibility: Internationally Wrongful Act of the State, Source of International Responsibility*, ¶ 2 U.N. Doc. A/CN.4/318/Add.5-8 (1980), *reprinted in* [1980] 2 Y.B. Int'l L. Comm'n 13, U.N. Doc. A/CN/4/SER.A/1980/Add.1 (Part 1) ................................................................................................................14

Jörn Axel Kämmerer, *Argentine Debt Crisis*, in *Max Planck Encyclopedia of International Law* (2017) ..........................................................................................17

*LG&E Energy Corp. v. Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, ¶ 246 (Oct. 3, 2006) .........................................................................14

*Rainbow Warrior (New Zealand v France)*, 20 R. Int'l Arb. Awards 217, 251 ¶ 75 (1990) ......................................................................................................................16

Restatement (Third) of Foreign Relations Law (1987) ................................................15

Beate Rudolf & Nina Hüfken, *Joined Case Nos. 2 Bvm 1-5/03 & 2 Bvm 1-2/06*, 101 Am. J. Int'l L. 857, 859–60, 862–64 (2007) .............................................16, 17

Sabine Schlemmer-Schulte, *Fragmentation of International Law: The Case of International Finance & Investment Law Versus Human Rights Law*, 25 Pac. McGeorge Global Bus. & Dev. L.J. 409, 413 (2012) ..........................................16

*State Responsibility,* Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4.Ser.A/2001/Add.1 (Part 2) ...................................................................15, 16

Alan O. Sykes, *Economic "Necessity" in International Law*, 109 Am. J. Int'l L. 296, 310 (2015) ....................................................................................................16

John B. Taylor, Under Sec. of Treas. for Int'l Affairs, *Sovereign Debt Restructuring: A US Perspective*, Peterson Institute for Int'l Economics (Apr. 2, 2002) (https://www.piie.com/commentary/speeches-papers/sovereign-debt-restructuring-us-perspective) ..................................................................................2

U.S. Dep't Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019) (https://home.treasury.gov/news/press-releases/sm594) .......................................................12

U.S. Dep't of Treasury, OFAC FAQs: General Questions (Feb. 6, 2019) (https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic).......................................................................................... 4, 5, 13

U.S. Dep't of Treasury, OFAC FAQs: FAQ No. 1 (Feb. 6, 2019) (https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic)................................................................................................4

U.S. Dep't of Treasury, OFAC FAQs: FAQ No. 547 (July 19, 2018) (https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic)..............................................................................................13

U.S. Dep't of Treasury, OFAC FAQs: FAQ No. 808 (Feb. 18, 2020) (https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx#venezuela) ...........................................................................................6

## INTRODUCTION

This case is not just about a default on two of the Republic's debt obligations, which the Republic acknowledges and is committed to resolving in an orderly and consensual manner. The future of Venezuela's economic recovery and the welfare of the Venezuelan people are at stake. Granting Plaintiffs the relief they seek on the timetable they demand will undermine Venezuela's ability to conclude consensual debt-restructuring negotiations with its multitude of creditors.

Plaintiffs are part of a small but growing cadre who seek to advantage themselves by winning a race to the courthouse. But the Court should not enter judgment now. Plaintiffs do not and cannot deny that if this Court proceeds to judgment now, it will trigger an avalanche of new cases. Moreover, the Pharo Plaintiffs' position—disclosed for the first time in their Reply Brief—is that the entry of judgment will forever advantage them vis-à-vis *all* the Republic's other debtholders. As such, the Pharo Plaintiffs may not obtain a judgment without a specific license from the Office of Foreign Assets Control ("OFAC").

Independently, this Court has broad discretion to stay proceedings. Plaintiffs do not and cannot deny that Venezuela faces an extraordinary humanitarian, political, and economic crisis, and that this case implicates serious foreign-policy concerns. Entering judgment now threatens the efforts of Interim President Guaidó to return Venezuela to economic prosperity and to return its government to the Venezuelan people. And it threatens the interests of the United States, which strongly supports the Guaidó government's efforts to restore democracy and protect the Republic's assets. These are, indisputably, exceptional circumstances. The Court should exercise its discretion to enter a stay, as Chief Judge Stark did in the District of Delaware, or, at minimum, seek the views of the United States.

**ARGUMENT**

I.   **The Court Should Not Enter A Judgment For The Pharo Plaintiffs Unless And Until They Produce An OFAC License**

Plaintiffs have now disclosed an important new position: they contend (for the first time) that entry of judgment will—without any further action by any court—relieve the Pharo Plaintiffs of future obligations set forth in their debt contracts with the Republic, namely provisions that "allow a supermajority to bind nonconsenting creditors to the terms of restructured bonds." Reply 5. Such clauses, known as "collective action clauses" (CACs), were introduced into sovereign bonds in the early 2000's with the encouragement of the International Monetary Fund and other stewards of the global financial system.[1] The United States actively urged their inclusion to "create a more orderly and predictable workout process" should the need arise, because CACs "would prevent a small minority from delaying or otherwise disrupting an agreement [on restructuring] and would thereby add predictability to the restructuring process."[2] Since then, "the inclusion of [CACs] in sovereign bonds, which became popular in the 2000s, has helped expedite the restructuring process."[3]

Plaintiffs assert that *entry* of judgment will relieve the Pharo Plaintiffs of any obligations they (or their successors-in-interest) might have in the future under applicable CACs. Under this theory, entry of judgment will amend the contract without the consent of the requisite percentage of bondholders, effectively rewriting the contract. Such a result would undermine decades of U.S.

---

[1] *See* Int'l Monetary Fund, *Collective Action Clauses in Sovereign Bond Contracts—Encouraging Greater Use* (June 6, 2002) (https://www.imf.org/external/np/psi/2002/eng/060602a.pdf).

[2] John B. Taylor, Under Sec. of Treas. for Int'l Affairs, *Sovereign Debt Restructuring: A US Perspective*, Peterson Institute for Int'l Economics (Apr. 2, 2002) (https://www.piie.com/commentary/speeches-papers/sovereign-debt-restructuring-us-perspective).

[3] Congressional Research Service, *Sovereign Debt in Advanced Economies: Overview and Issues for Congress* 14 n.37 (Oct. 28, 2013) (https://fas.org/sgp/crs/misc/R41838.pdf).

policy on sovereign debt and severely exacerbate the rush to the courthouse. The Republic strongly disagrees with Plaintiffs' legal theory, which disregards the fact that a CAC is a form of intercreditor undertaking—in which all bondholders agree to be bound to each other in certain circumstances—that cannot be nullified without the consent of the other bondholders who are the beneficiaries of that undertaking. Plaintiffs' theory also misapprehends the limited nature of the "merger and bar" doctrine by failing to recognize that a judgment will not supersede the CAC provisions.[4]

Plaintiffs, however, will undoubtedly continue to take that position in the future, perhaps on appeal or in other courts. And because Plaintiffs insist that the judgment will relieve the Pharo Plaintiffs of existing contractual obligations, this Court cannot docket a judgment for the Pharo Plaintiffs until they obtain an OFAC license. An unlicensed alteration of property rights in Venezuela bonds would constitute a violation of the U.S. economic sanctions. Indeed, in another case, Judge Stanton recently denied summary judgment in view of the existing Venezuela sanctions regime. *See* Opinion & Order, *Dresser-Rand Co. v. Petroleos de Venezuela, S.A.*, No. 19 Civ. 2689

---

[4] Upon entry of judgment on a claim of breach of a contract to repay money, the "debt created by contract merges with a judgment entered on that contract, so that the contract debt is extinguished and only the judgment debt survives." *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004). But the "'merger' of the contract debt with the judgment debt does not extinguish the underlying contract itself." *NML Capital, Ltd. v. Republic of Argentina*, No. 11 Civ. 4908 (TPG), 2015 WL 3542535, at *4 (S.D.N.Y. June 5, 2015) (citing *Exp.-Imp. Bank of the Republic of China v. Grenada,* No. 13 Civ. 1450 (HB), 2013 WL 4414875, at *3 (S.D.N.Y. Aug. 19, 2013)). "Rather than extinguish the *contract,* merger merely extinguishes the *claim* that was adjudicated from that contract, and replaces that claim with the final judgment." *Id.* (emphasis in original). In *NML* and *Export-Import Bank*, Judges Griesa and Baer each held that entry of judgment on a claim for non-payment did not preclude later claims for breach of different provisions of the same contract that gave rise to the initial claim for non-payment. *See id.*; *see also* Mitu Gulati, *Do Judgements Trump CACs?*, Credit Slips (Feb. 10, 2020, 12:58 PM) (https://www.creditslips.org/creditslips/2020/02/do-judgements-trump-cacs.html).

(S.D.N.Y. Feb. 11, 2020), ECF No. 59. This Court likewise should not enter judgment at least until the Pharo Plaintiffs produce a license from OFAC.

    **1.** To begin, the President has blocked the bonds at issue in this case. Executive Order 13808 prohibits "all transactions related to" "bonds issued by the Government of Venezuela." Exec. Order No. 13808, § 1(a)(iii), 82 Fed. Reg. 41,155 (Aug. 24, 2017). And Executive Order 13884 provides that all "property and interests in property" of the Republic in the United States "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Exec. Order No. 13884, § 1(a), 84 Fed. Reg. 38,843 (Aug. 5, 2019). Because the bonds at issue in this case are property in which Venezuela has an "interest" (such as enforcement of its terms), they are "blocked" pursuant to Executive Order 13884. Further, Executive Order 13808 provides that the bonds "may not be transferred" without permission. *See Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981).

    The President issued these Executive Orders under the International Emergency Economic Powers Act, which authorizes broad presidential powers that include, in specified circumstances, the ability to "prevent or prohibit *any* … use, transfer … or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B); *see also* Venezuela Defense of Human Rights and Civil Society Act of 2014, Pub. L. 113-278, 128 Stat. 3011 (set out as a note to 50 U.S.C. § 1701). Economic sanctions authorized by these statutes use "the blocking of assets and trade restrictions to accomplish foreign policy and national security goals." U.S. Dep't of Treasury, OFAC FAQs: General Questions, FAQ No. 1 (Feb. 6, 2019) (https://www.treas-ury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic). When property is "block-ed," "the exercise of powers and privileges normally associated with ownership is prohibited with-out authorization from OFAC." *Id.* FAQ No. 9.

**2.** A judgment altering the terms of the bonds by superseding the CACs would amount to a transfer of blocked property within the meaning of these Executive Orders. Applicable regulations define "property interests" and "transfer" as used in the Executive Orders with extraordinary breadth. "The terms property and property interest" include debts, obligations, notes, bonds, "any other financial instruments," and "contracts of any nature whatsoever … or interest or interests therein, present, future, or contingent." *Id.* § 591.309. And a "transfer" is "any actual or purported act or transaction … the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." *Id.* § 591.310. Without limiting this general definition, a "transfer" includes, expressly, "**the issuance, docketing, or filing of … any judgment**" that alters rights with respect to property. *Id.* (emphasis added). This is what Plaintiffs are asking the Court to do here. *Any* unauthorized transfer of "blocked" property—*including* by the "issuance…of…any judgment"— "is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege." *Id.* § 591.202(a).

OFAC issued a "general license" (General License 3G, dated Oct. 1, 2019) permitting certain transactions in the bonds at issue.[5] But in November 2019, it issued a superseding regulation, which provides:

> *Notwithstanding the existence of any general license* issued under this part, or issued under any Executive order issued pursuant to the national emergency declared in E.O. 13692, the entry into a settlement agreement or *the enforcement of any* lien, *judgment*, arbitral award, decree, or other order through execution, garnishment, or other judicial process *purporting to*

---

[5] OFAC issues two types of licenses: a "general license authorizes a particular type of transaction for a class of persons without the need to apply for a license," and a "specific license is a written document issued by OFAC to a particular person or entity, authorizing a particular transaction in response to a written license application." U.S. Dep't of Treasury, OFAC FAQs: General Questions, FAQ No. 74 (Feb. 6, 2019) (https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic).

> *transfer or otherwise alter or affect property or interests in property* blocked pursuant to § 591.201, as referenced in §591.506(c), is prohibited *unless authorized pursuant to a specific license issued by OFAC pursuant to this part*.

*Id.* § 591.407. In short, the Pharo Plaintiffs contend that they are on the cusp of obtaining not merely a money judgment, but a self-executing judgment that would alter or affect interests in blocked property (*i.e.*, by discharging Plaintiffs from any future contractual obligations under the bonds). Section 407 prohibits such a judicial alteration of interests in blocked property unless "authorized pursuant to a specific license issued by OFAC." *Id.*

**3.** Plaintiffs apparently have not sought a specific license from OFAC. They instead point out that sanctions do not ordinarily prohibit the *entry* of judgment. Reply 8 (citing U.S. Dep't of Treasury, OFAC FAQ No. 808 (Feb. 18, 2020) (https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx#venezuela)). But in some cases "**the issuance, docketing, or filing of … any judgment**" *is* a prohibited transfer. 31 C.F.R. § 591.310. And OFAC published guidance in December 2019 highlighting the need for a specific license to create or perfect "any legal or equitable interests" in blocked Venezuelan property through "judicial process":

> A specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case. However, a specific license from OFAC is required for the entry into a settlement agreement or the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591). This includes the purported creation or perfection of ***any legal or equitable interests*** (including contingent or inchoate interests) in blocked property.

FAQ No. 808 (Feb. 18, 2020) (emphasis added).

Because Plaintiffs argue that the mere entry of judgment extinguishes certain contractual rights and obligations under the Bonds (Reply 6), a judgment for the Pharo Plaintiffs would amount

to a "judicial process purporting to … alter or affect property or interests in blocked property" and the purported "creation or perfection" of "legal or equitable interests," requiring a specific license from OFAC by operation of 31 C.F.R. § 591.407 as explained by FAQ 808. As Judge Stanton did in *Dresser-Rand*, *supra*, the Court should refrain from entering summary judgment at least until the Pharo Plaintiffs produce a specific license.

## II.   The Court Should Stay These Cases

Plaintiffs characterize the Republic's requested relief as an "indefinite" stay (Reply 3-5). It is true that the Republic seeks a stay until the restoration of democratic rule in Venezuela and a reasonable opportunity for the negotiation of a consensual debt restructuring. In fact, many stays are of a to-be-determined duration. Such stays are automatic in bankruptcy cases, *see* 11 U.S.C. § 362, and there are other circumstances in which the courts insist that parties make every reasonable effort to reach accommodation even if such efforts are of an indeterminate duration, *see, e.g., In re Northwestern Airlines Corp.*, 483 F.3d 160, 168 (2d Cir. 2007) (authorizing court to enjoin union's self-help against bankrupt airline until "every reasonable effort" at reaching an agreement had been exhausted).

Moreover, in matters implicating foreign policy, courts have extremely broad discretion. In *In re Assicurazioni Generali, S.P.A.*, the Second Circuit issued a stay that lasted more than a year, then kept the case *sub judice* for an additional three years, during which it twice sought the views of the Secretary of State. 592 F.3d 113, 117 (2d Cir. 2010). Ultimately, the court dismissed the claims in deference to the foreign policy of the United States as expressed by the Executive. *Id.* at 119–20; *accord Whiteman v. Dorotheum GmbH*, 431 F.3d 57, 59–60 (2d Cir. 2005) (dismissing under "'case-specific deference' to the expressed foreign policy interests of the United States"). In other cases concerning sovereign debt, courts have entered stays of specified duration and extended them. For example, in *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, on

which Plaintiffs rely, the district court first granted a six-month stay to enable Peru to negotiate its sovereign debt and liquidate certain assets of its central bank, 165 B.R. 379, 389 (S.D.N.Y. 1994), and, after the stay expired without a resolution of those negotiations, the court extended the stay another two months, 1995 WL 102840 (S.D.N.Y. Mar. 8, 1995).

Accordingly, this Court has ample discretion to stay proceedings here until the restoration of democratic rule in Venezuela and the parties attempt to negotiate a consensual debt restructuring. Alternatively, the Court has authority to enter a stay for a finite duration. If the Court is of a view that a finite duration is appropriate, we respectfully suggest 120 days, with a duty to provide periodic reports about the circumstances bearing on the continuation of the stay.

### A. This Court Should Exercise Its Inherent Power to Stay These Cases.

This court has broad inherent power to craft a reasonable stay tailored to prevent the irreparable harm that entering judgments in these cases will cause the Republic, and each stay factor strongly counsels in favor of a stay.

**1. Plaintiffs' Private Interests.** Plaintiffs will not be prejudiced by temporarily maintaining the status quo to enhance the Republic's ability to enter into consensual debt-restructuring negotiations. To the contrary, a stay will better enable the Republic to facilitate the resolution of Plaintiffs' debts—together with the debts of the Republic's many other creditors—on consensual and mutually beneficial terms. Plaintiffs argue that a stay in favor of sovereign restructuring proceedings "would transform any supposedly 'voluntary' debt restructuring into 'the equivalent of a judicially-enforced bankruptcy proceeding." Reply 5. That is wrong. Plaintiffs will be free to exercise their contractual rights in connection with that voluntary process and seek judicial relief should the process produce a result they deem unacceptable.

Instead of awaiting the negotiation process like the vast majority of creditors, Plaintiffs wish to jump to the head of the line, seeking relief from the future effect of CACs. Reply 5–6. To

the extent that Plaintiffs own bonds with CACs, they accepted those terms when they purchased the bonds. They cannot complain now about the terms of bonds they voluntarily acquired.

Nor will Plaintiffs be prejudiced in relation to the other cases. Plaintiffs themselves recognize that all attempts to enforce judgments against the Republic have been stayed. *E.g.*, *Crystallex Int'l Corp. v. PDV Holding Inc.*, No. 15 Civ. 1082, 2019 WL 6785504 (D. Del. Dec. 12, 2019). The stay in Delaware will last at least until the conclusion of Supreme Court proceedings—months from now, if not longer. *Id.* at *4–5. And the court in those cases itself recognized that circumstances may warrant further extending the stay. *See id.* If the stay in Delaware is lifted, moreover, there will still be further proceedings on the Republic's motion to quash the court's writ of attachment. *See id.* at *5. And even if those motions are denied, there will be further briefing concerning the process of conducting a sale of PDVSA's assets—if and only if OFAC grants a license for such a sale. Maintaining the status quo while those proceedings are on hold will not prejudice Plaintiffs in any way. If circumstances change, the Court can modify its stay as necessary.

**2. Defendant's Interests.** In contrast to Plaintiffs' purported interests, the interests of the Republic in a stay are particularly strong: with billions of dollars at issue, a denial of the motion for a stay would be an unmistakable signal to the market encouraging "a chaotic and uncontrolled scramble for [the Republic's] assets in a variety of uncoordinated proceedings in different courts," *In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992) (quotation source omitted). Allowing this case to proceed would thus undermine the Republic's sovereign efforts to address the unprecedented humanitarian crisis within Venezuela and, consistent with U.S. policy, to preserve the Republic's assets for the benefit of the Venezuelan people. That was a major reason why Chief Judge Stark stayed proceedings in *Crystallex*. He did not want "to create a 'run on the bank,' that is, an influx of creditors to the Court, with negative consequences for the Republic, for U.S. policy

9

(which favors an orderly transition of power in the Republic and a coordinated restructuring of its debts), and, potentially, th[e] Court." *Crystallex*, 2019 WL 6785504, at *3.

Plaintiffs do not meaningfully contest that, if the Court enters judgment now, many more cases are sure to follow. They argue only that there will be no real harm unless the Court permits enforcement under 28 U.S.C. § 1610(c). Reply 9–10. But that argument makes no sense if, as Plaintiffs assert, entry of judgment itself will alter their contractual rights. Moreover, 28 U.S.C. § 1610(c) only forestalls enforcement *in the United States*; Plaintiffs may attempt to go after the Republic's assets abroad even before the ink on the Court's order dries. That will, of course, pressure other creditors to resort to legal action that will disrupt, rather than facilitate, the voluntary, orderly restructuring that ultimately best serves all stakeholders.

Finally, Plaintiffs express concern that the Republic's transition to democracy may or may not succeed. But the fact that Maduro retains *de facto* power is, precisely, an argument that favors the stay: because the United States recognizes Interim President Guaidó and the National Assembly, *they* are the rightful actors on behalf of the Republic who should be afforded a reasonable opportunity by this Court to secure voluntary agreement among creditors for a restructuring.

**3. Judicial Resources.** Continuing the litigation at this stage would be wasteful of judicial resources. Plaintiffs do not dispute that the more quickly this Court moves forward, the more cases it will attract. And, while Plaintiffs say that they can "begin the enforcement process" once they have a judgment, Reply 10, they concede that they cannot do so without an OFAC license, which they have not sought. At the very minimum, the Court should not proceed to judgment before Plaintiffs even seek an OFAC license. The more efficient option is for the Court to stay litigation until the Republic can enter into a consensual debt resolution plan in accordance with U.S. sanctions. At that future stage, any plaintiffs who are unwilling to participate in the restructuring may resort to judicial proceedings consistent with their contract rights.

**4. Non-Parties' Interests.** These lawsuits—and those that will follow if judgment is entered now—have the potential to undermine severely the Guaidó government's efforts to return Venezuela to economic prosperity. Plaintiffs' conclusory claims to the contrary—that this litigation will not affect the Venezuelan people or Venezuela's other creditors (Reply 11)—are implausible on their face. Plaintiffs admit that the very purpose of pursuing judgment now is to put them at an advantage vis-à-vis the Republic's other creditors and bondholders. *E.g.*, Reply 5–6 (asserting that judgment would relieve Plaintiffs from their contractual rights and obligations under the 7.75% 2019 Bonds). Those few creditors who are proceeding should not be rewarded with an advantage over a much larger number of similarly situated creditors and at the expense of the millions of Venezuelans already enduring desperate economic conditions.

**5. The Public Interest.** Finally, it is in the public interest to stay this case. As in *Crystallex*, proceeding to judgment now "would undermine a foreign ally, worsen a grave humanitarian crisis, and tread on diplomatic sensitivities." 2019 WL 6785504, at *3 n.10. The better course—in accord with the United States' interest in "an orderly transition of power in the Republic and a coordinated restructuring of its debts," *id.* at *3—is a temporary stay to enable the Republic to enter into consensual debt-restructuring negotiations.

Plaintiffs assert that the United States has an interest in "the enforcement of valid contracts." Reply 11. But a stay here does not undermine that interest. The Republic is not seeking to repudiate its obligations; it seeks only a temporary stay so that it can better resolve its debts, both to Plaintiffs and to the Republic's many other creditors. Moreover, whatever the United States' general interest in contract rights, that interest is vastly outweighed by the United States' specifically articulated interest in "support[ing] Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy," and "prevent[ing] further

diverting of Venezuela's assets by Maduro and preserv[ing] these assets for the people of Vene-zuela."[6] Staying this litigation would further U.S. policy by discouraging efforts by aggressive claimants to disturb the equal ranking of similarly situated creditors through litigation, collection actions, attachments, or other means. But if there is any doubt about the United States' views on this case, the Court should solicit them, as Chief Judge Stark did. *Crystallex*, 2019 WL 6785504, at *11.

### B.   The Court Should Stay These Cases In The Interest Of International Comity.

Beyond the traditional stay factors already articulated, international comity also supports the entry of a stay to enable the Republic to enter into consensual and mutually beneficial debt-restructuring negotiations. To be sure, these grounds for a stay are uncommon. But that is because the case is extraordinary: the Republic faces an unparalleled humanitarian and economic crisis; a dictator who will not leave; and U.S. government sanctions to address what two Presidents from different parties have deemed "an unusual and extraordinary threat to the national security and foreign policy of the United States," Exec. Order No. 13692, 80 Fed. Reg. 12,747 (Mar. 8, 2015); *see* Exec. Order No. 13884, 84 Fed. Reg. 38,843 (Aug. 7, 2019) (taking "additional steps with respect to the national emergency declared in Executive Order 13692").

### 1.   Abstention Based On International Comity Is Appropriate.

Plaintiffs do not dispute that courts in this Circuit facing sovereign debt restructurings have stayed proceedings to permit time for a negotiated outcome between a sovereign and its creditors. *See, e.g.*, *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 855–56 (2d Cir. 1997); *Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d 516, 519 (2d Cir. 1985); *Pravin*, 165

---

[6] Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019) (https://home.treasury.gov/news/press-re-leases/sm594).

B.R. at 387. Instead, Plaintiffs argue that such stays cannot be entered before debt-restructuring negotiations have begun. Reply 12–14. But the cases Plaintiffs rely on do not actually support such a bright-line rule. Notably, the sovereigns in *Pravin* and *Allied Bank* (Peru and Costa Rica, respectively) were not experiencing anything like the political, economic, and humanitarian disaster confronting the Republic. This is not merely a sovereign debt crisis. It is the largest economic collapse outside of war or state collapse, and the worst humanitarian and refugee crisis on Earth other than Syria. The Republic has begun the process of formulating both (1) a comprehensive economic recovery plan, to be implemented once the political and humanitarian crisis can be abated; and (2) a comprehensive, orderly, and consensual restructuring of its outstanding financial obligations, supported by the international financial community, and based on published guidelines. *See* Rep. Br., Ex. 1. This plan fully comports with U.S. debt restructuring policy. But this process will take time. Under these truly exceptional circumstances, the "spirit of international comity" supports a reasonable application of the considerations that animated the courts in *Canada Southern Railway Co. v. Gebhard*, 109 U.S. 527 (1883), *Pravin*, and *Allied Bank* to ensure that the Republic can address its humanitarian crisis and implement strong macroeconomic policies in connection with an orderly debt restructuring plan that is comprehensive, voluntary, and supported by the relevant international financial institutions and actors.

Plaintiffs also argue that such stays are unwarranted when they are "inconsistent with the law and policy of the United States." Reply 14 (quoting *Allied Bank*, 757 F.2d at 522). But that is emphatically not the case here. U.S. policy, including OFAC sanctions and explicit statements by the Executive Branch, manifestly support a stay. *See* Rep. Br. 13, 18. Indeed, any debt restructuring process will require a substantial modification of U.S. sanctions currently in place. *See* U.S. Dep't of Treasury, OFAC FAQs: General Questions, FAQ No. 547 (July 19, 2018). Thus, it is not, as plaintiffs implicitly suggest, some sort of procrastination of the Interim Government that has

caused a delay in the debt restructuring; it is rather that the U.S. Government has effectively for-bidden a debt restructuring until the political transition happens. And Plaintiffs are wrong (Reply 14) that the Second Circuit "rejected" the argument Venezuela makes in *Allied Bank*. In that case, the United States filed a brief expressly stating that U.S. policy did not support a stay because Costa Rica had "attempted [a] *unilateral* restricting of private obligations," which the United States considered to be "inconsistent with th[e] system of international cooperation and negotiation and thus inconsistent with United States policy." 757 F.2d at 519 (emphasis added). Here we have the opposite: repeated, consistent, and unequivocal support for the Guaidó government (*see* Rep. Br. 13, 18), and detailed plans for a *consensual* debt restructuring (Rep. Br., Ex. 1).

Plaintiffs also argue that the Venezuela sanctions regime does not block entry of judgment, so U.S. policy does not support a stay. That argument does not hold water. Plaintiffs seek a self-executing judgment that is forbidden by applicable regulations without a specific license. *See supra* pp. 1–6. And the Executive Branch makes its views known through various means, including through statements by policymakers. *See* Rep. Br. 13, 18. If there is any doubt about the United States' position, the Court should invite the government's views, as Chief Judge Stark did.

## 2. A Stay Is Justified Under The Doctrine Of Necessity.

The necessity doctrine allows a state to temporarily defer its financial obligations while it is "threatened by a serious danger to its existence, to its political or economic survival, [or] to the possibility of maintaining its essential services in operation." *LG&E Energy Corp. v. Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, ¶ 246 (Oct. 3, 2006); *see also, e.g.*, Roberto Ago (Special Rapporteur), *Addendum to the Eighth Report on State Responsibility: Internationally Wrongful Act of the State, Source of International Responsibility*, ¶ 2 U.N. Doc. A/CN.4/318/Add.5-8 (1980), *reprinted in* [1980] 2 Y.B. Int'l L. Comm'n 13, U.N. Doc. A/CN.4/SER.A/1980/Add.1 (Part 1) (a state may invoke the necessity doctrine in a case of

"extreme peril," "a grave danger to the existence of the State itself, its political or economic survival, [or] the continued functioning of its essential services"). The doctrine clearly applies in the case of Venezuela, a fragile state facing an unprecedented economic collapse, a mass exodus of human capital, and a complex humanitarian emergency.

Plaintiffs are wrong that customary international law "do[es] not apply here because the parties' respective obligations are explicitly governed by … New York law, not international law." Reply 16. International law "is part of our law." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 623 (1983) (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)); *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1234 (2d Cir. 1995) (noting that "[i]nternational law, accepted by federal common law," superseded a New York statute). Because "international law[] *is* federal law," it "supersedes inconsistent State law." *Restatement (Third) of Foreign Relations Law* § 115 cmt. e (1987) (emphasis added); *id.* § 111 cmt. d ("[C]ustomary international law … [is] federal law and as such [is] supreme over State law.").

Contrary to Plaintiffs' assertion, the necessity doctrine is not merely a "substantive defense to liability." Reply 15. The doctrine is "intend[ed] to *provide flexibility* in the application of international obligations," and "may justify setting aside *or suspending* an obligation." *Cont. Cas. Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168 (Sept. 5, 2008) (emphasis added); *see also State Responsibility,* Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4.Ser.A/2001/Add.1 (Part 2) (noting that the necessity doctrine applies in "those exceptional cases where the only way a State can safeguard an essential interest … is, *for the time being*, not to perform some other international obligation" (emphasis added)). Thus, "[w]here [a state's] compliance with an international obligation would impose such an economic burden that vital public services would be jeopardized," the necessity doctrine provides that "there is no violation of

international law in *postponing* payment." Alan O. Sykes, *Economic "Necessity" in International Law*, 109 Am. J. Int'l L. 296, 310 (2015) (emphasis in original).

Plaintiffs' insistence that the necessity doctrine does not apply to a State's obligations "under a private contract," Reply 18, misstates the law. A state may invoke the necessity doctrine to "preclud[e] the wrongfulness of an act not in conformity with an international obligation," *State Responsibility,* Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4.Ser.A/2001/Add.1, which includes "all international obligations *of* the State and not only those owed *to* other States," *id.* at 87 (emphasis in original); *see also id.* at 35 ("The terminology of breach of an international obligation of the State is long established and is used to cover both treaty *and* non-treaty obligations." (emphasis added)). That is because "*any* violation by a State of *any* obligation, of *whatever origin*, gives rise to State responsibility." *Rainbow Warrior (New Zealand v France)*, 20 R. Int'l Arb. Awards 217, 251 ¶ 75 (1990) (emphasis added). A state's "conduct contrary to the rights of others"—including private parties—simply put, constitutes a "breach of an obligation" under international law. *State Responsibility*, *supra*, at 35.

Plaintiffs rely on an outlier (and divided) decision by the German Federal Constitutional Court in the *Argentine Necessity Case,* Bundesverfassungsgerichts [BVerfG] May 8, 2007, 138 I.L.R. 1, Reply 18, without mentioning that the decision "led to a wave of criticism," Ralph Janik, *International Responsibility*, in *International Law in Domestic Courts: A Casebook* 387, 428 (Andre Nollkaempe *et al.*, eds., 2019), as having been made "in complete ignorance of … long-standing practice." Sabine Schlemmer-Schulte, *Fragmentation of International Law: The Case of International Finance & Investment Law Versus Human Rights Law*, 25 Pac. McGeorge Global Bus. & Dev. L.J. 409, 413 (2012). Scholars have long dismissed the majority as "unpersuasive," agreeing with the dissent that actual practice "clearly indicate[s] that necessity constitute[s] a general principle of law irrespective of the legal nature of the creditor." Beate Rudolf & Nina Hüfken, *Joined*

*Case Nos. 2 Bvm 1-5/03 & 2 Bvm 1-2/06*, 101 Am. J. Int'l L. 857, 859–60, 862–64 (2007). Indeed, the dissent pointed to a decision by the Italian Supreme Court of Cassation that specifically recognized "the obligation flowing from international law," even in "the context of private-law disputes," to respect "the right of the State in question to avert this necessity." ECF 47-1 at 20 (emphasis added) (citing *Corte Supra di Cassazione*, *Ordinanza* of 27 May 2005, RGN 6532/04). Thus, "[c]onsidering that the state of necessity belongs to the general principles of law … being rooted in national legal orders worldwide, there is no need to positively establish that the principle has an effect on creditors other than sovereign States." Jörn Axel Kämmerer, *Argentine Debt Crisis*, in *Max Planck Encyclopedia of International Law* (2017); *see also* ECF 47-1 at 17 (dissent in German case, noting that the necessity doctrine has been "reasoned and formulated for many years in cases in which no explicit reference was made to private-law systems, as an expression of a fundamental, general legal conviction").

Scholars also argued that accepting the *Argentine Necessity Case* decision would create perverse incentives, as "'hold out' creditors not participating in debt restructuring would be privileged," creating "an incentive for blocking negotiations." Kämmerer, *supra*; *see also id.* (noting that the court's reasoning "would result in the state of necessity objection being devoid of any effect in most sovereign defaults"). In short, the German Constitutional Court's "formalist distinction" between sovereign debtors and private debtors "is artificial," as "the substantive interests at stake … are identical irrespective of the forum in which they are adjudicated." Rudolf & Hüfken, *supra*, at 864. This Court should therefore reject that one outlier opinion.

### 3. The Republic Is Unable To Access Resources Necessary To Perform Or Settle Its Financial Obligations At This Time.

Plaintiffs do not dispute that, under present circumstances, it is impossible for the Republic to perform or settle its debts and obligations in the absence of an economic turnaround in

Venezuela. And they acknowledge that the Guaidó administration cannot itself access the limited financial resources located in Venezuela because of the Maduro regime's continued domination of key Venezuelan governmental, industrial, and financial institutions. Reply 4. Instead, Plaintiffs argue that impossibility is "not a defense to breach of a private contract" under New York law. Reply 19–20. That is nonresponsive. The Republic is not asserting the *defense* of impossibility, it is requesting a stay in light of the current political and economic reality in Venezuela. That request is amply justified for all of the reasons articulated above.

## CONCLUSION

For the foregoing reasons, and those set forth the Republic's prior submissions, the Court should not enter summary judgment, but should instead stay this case.

Dated: March 3, 2020
New York, New York

Respectfully submitted,

ARNOLD & PORTER
KAYE SCHOLER LLP

By: _____
Kent A. Yalowitz
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689
Kent.Yalowitz@arnoldporter.com

E. Whitney Debevoise
Stephen K. Wirth
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
Whitney.Debevoise@arnoldporter.com
Stephen.Wirth@arnoldporter.com

*Attorneys for the Bolivarian Republic of Venezuela*

18