UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:  _____         │
│ DATE FILED:   9/30/2020          │
└─────────────────────────────────┘
```

CASA EXPRESS CORP., as Trustee of CASA
EXPRESS TRUST,

                          Plaintiff,

          -against-

BOLIVARIAN REPUBLIC OF VENEZUELA,                    18 Civ. 11940 (AT)

                          Defendant.


PHARO GAIA FUND LTD. and PHARO MACRO
FUND LTD.,

                          Plaintiffs,                19 Civ. 3123 (AT)

          -against-

THE BOLIVARIAN REPUBLIC OF VENEZUELA,                **ORDER**

                          Defendant.

ANALISA TORRES, District Judge:

        In these two related cases, Plaintiffs, Casa Express Corp. ("Casa Express"), Pharo Gaia

Fund Ltd. ("Pharo Gaia"), and Pharo Macro Fund Ltd. ("Pharo Macro"), seek to recover on

defaulted bonds issued by Defendant, the Bolivarian Republic of Venezuela.  Pl. Mem. at 1, ECF

No. 60.[1]  Defendant does not contest liability, but represents that, in light of the ongoing political

and economic crisis in Venezuela, it is not in a position to litigate these cases or pay judgments,

and intends to seek restructuring of its financial obligations once its situation stabilizes.  Def.

Mem. at 8–23, ECF No. 66.

---

[1] All ECF citations are to the docket in case number 18 Civ. 11940.

Before the Court are Defendant's motion for a stay of the litigation, ECF No. 65, and Plaintiffs' joint motion for summary judgment, ECF No. 59. For the reasons stated below, Defendant's motion is DENIED, and Plaintiffs' motion is GRANTED.

**BACKGROUND[2]**

I.    <u>The Bonds</u>

These cases involve three series of bonds. In 1998, Defendant issued a series of bonds designated ISIN US922646AT10 (the "1998 Bonds"). 56.1 Stmt. ¶ 7, ECF No. 61. Casa Express is a beneficial owner of $1,845,000 principal amount of the 1998 Bonds. *Id.* ¶ 8. In 2001, Defendant issued a series of bonds designated ISIN USP9395PAA95 (the "2001 Bonds"). *Id.* ¶ 19. Casa Express is a beneficial owner of $27,170,000 principal amount of the 2001 Bonds, *id.* ¶ 20, and Pharo Macro is a current beneficial owner of $1,500,000 principal amount of the 2001 Bonds. *Id.* ¶ 21. In 2009, Defendant issued a series of bonds designated ISIN USP97475AN08 (the "2009 Bonds"). *Id.* ¶ 33. Pharo Macro is a beneficial owner of $180,500,000 principal amount of the 2009 Bonds. *Id.* ¶ 34. Pharo Gaia is a current beneficial owner of $114,000,000 principal amount of the 2009 Bonds. *Id.* ¶ 35.

The 1998 Bonds and the 2001 Bonds have materially identical terms. The terms of the 1998 Bonds are set forth in their "Registered Global Security" (the "1998 Note"), and the terms of the 2001 Bonds are listed in their "Regulation S Global Note" ("the 2001 Note"). *Id.* ¶¶ 9, 22. Both series of bonds matured on August 15, 2018 and accrue interest at a rate of 13.625% per year "until the principal hereof is paid or made available for payment." *Id.* ¶¶ 12–14, 25–27. Half of the annual interest is payable biannually on February 15 and August 15 of each year. *Id.* ¶ 13, 26. The terms of the 2009 Bonds are set forth in their "Regulation S Global Note" (the

---

[2] The following facts are drawn from the parties' pleadings and submissions, including the complaints and Plaintiffs' Rule 56.1 statement of undisputed fact, which Defendant does not contest. *See* ECF No. 67.

"2009 Note"). *Id.* ¶ 36. They matured on October 13, 2019, and accrue interest at a rate of

7.75% per year "until the principal hereof is paid or made available for payment," with half of

the annual interest payable biannually on April 13 and October 13 of each year. *Id.* ¶¶ 39–41.

All three series of bonds were issued pursuant to fiscal agency agreements. *Id.* ¶¶ 45, 50–

51. Among other things, those agreements provide that Defendant waives its sovereign

immunity with respect to claims arising out of the bonds, consents to be sued in Supreme Court,

New York County or in the United States District Court for the Southern District of New York,

and agrees that New York law will govern the agreements and the bonds. *Id.* ¶¶ 145–149; 1998

Fiscal Agency Agreement §§ 12, 14, ECF No. 64-1; 2001 Fiscal Agency Agreement §§ 12, 14,

ECF No. 64-2.

On the 1998 and 2001 Bonds, Defendant failed to make two prematurity interest

payments—on February 15, 2018 and August 15, 2018—and failed to pay the entire principal

amount when those bonds matured on August 15, 2018. 56.1 Stmt. ¶¶ 56–63, 71–78, 86–93.

Defendant also failed to make two post-maturity payments on the 1998 and 2001 Bonds, on

February 15, 2019 and August 15, 2019. *Id.* ¶¶ 64–69, 79–84, 94–99. On the 2009 Bonds,

Defendant failed to make five prematurity interest payments—on October 13, 2017, April 13,

2018, October 13, 2018, April 13, 2019, and October 13, 2019—and failed to pay the entire

principal amount when those bonds matured on October 13, 2019. *Id.* ¶¶ 101–117.

II.     The Situation in Venezuela

The United States Department of State describes the current political status of Venezuela

as follows:

> Venezuela is legally a multiparty, constitutional republic, but for more than a
> decade, political power has been concentrated in a single party with an
> authoritarian executive exercising significant control over the judicial, citizens'
> power (which includes the prosecutor general and ombudsman), and electoral

branches of government, and standing up a parallel, illegitimate legislative body alongside the existing elected one.  On January 10, [2019] the term of former president Nicolas Maduro ended.  He sought to remain in power based on his claimed "victory" in the 2018 presidential elections widely condemned as neither free nor fair, a claim not accepted by the democratically elected National Assembly (AN).  On January 23, Juan Guaido, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the constitution related to vacancies.  Former president Maduro, with the backing of hundreds of Cuban security force members, refused to cede control over the instruments of state power, preventing interim president Guaido from exercising authority within the country.  In the 2015 legislative elections, opposition political parties gained supermajority (two-thirds) control of the AN.  The former Maduro regime, however, used its control over the Supreme Court (TSJ) to create the illegitimate Constituent National Assembly (ANC) that placed the AN in contempt, usurped its constitutional role to legislate, and weakened the constitution's separation of powers principle.

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/venezuela/; *see also* U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *U.S. Government Support for the Democratic Aspirations of the Venezuelan People*, https://www.state.gov/u-s-government-support-for-the-democratic-aspirations-of-the-venezuelan-people/.

The United States government recognizes Juan Guaidó as the legitimate president of Venezuela, and the National Assembly as the legitimate legislature.  *See U.S. Government Support for the Democratic Aspirations of the Venezuelan People*.  That determination is binding on this Court.  *See Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 137–38 (1938); *see also, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 & n.2 (3d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 936 (May 18, 2020); *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16 Civ. 1533, 2019 WL 2185040, at *5 (D.D.C. May 21, 2019) ("[B]ecause the United States has recognized Juan Guaidó as the Interim President of Venezuela, the Court will recognize the Guaidó government lawyers as the appropriate representatives of Venezuela.").

Venezuela is also in the midst of an economic, health, and human rights crisis.  *See, e.g.*, United Nations Office of the High Commissioner for Human Rights, *Venezuela Must Offer Concrete Steps to End Humanitarian Crisis, Say UN experts* (May 6, 2020), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25867&LangID=E (detailing a "spiralling economic crisis" including "food shortages, hyperinflation, power and water cuts and soaring unemployment," "many hospitals struggling to function without reliable electricity or even running water," "a shortage of medical supplies, protective equipment and medicine," an "education system [that] has lost thousands of teachers and [in which] many children no longer attend school because of lack of energy due to not having food at home or because they cannot afford transportation," and "a third of the population [that] is food insecure"); Anatoly Kurmanaev, *Venezuela's Collapse Is the Worst Outside of War in Decades, Economists Say*, N.Y. Times (May 17, 2019), https://www.nytimes.com/2019/05/17/world/americas/venezuela-economy.html.

On July 1, 2019, President Guaidó's government issued a memorandum titled "Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt" (the "Renegotiation Guidelines").  ECF No. 66-1.  The Renegotiation Guidelines state that "public external debt renegotiation cannot begin [while] the usurpation by [the] regime of Nicolas Maduro has not ended and the economic sanctions imposed on said regime by the United States of America and other countries have not been lifted," but that "once these events have occurred, it shall be the policy of the [Venezuelan government] to proceed with an orderly and consensual renegotiation of legacy private claims as soon as practicable thereafter, in accordance with the Special Law to be passed by the National Assembly."  *Id.* at 1.  It then sets out terms that the administration intends to govern the renegotiation process.  *Id.* at 1–4.

**DISCUSSION**

I.    Stay of Proceedings

Defendant requests that the Court "stay proceedings here until the restoration of democratic rule in Venezuela and the parties attempt to negotiate a consensual debt restructuring."  Def. Reply at 8, ECF No. 73; Def. Mem. at 8–23.

A district court has the inherent authority to stay an action, when there is a reason to do so.  A court's exercise of that authority is governed by five factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil ligation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Jiminez v. Credit One Bank, N.A.*, 377 F. Supp. 3d 324, 336 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

In cases where a foreign sovereign seeks a stay to facilitate the restructuring of its debts, courts must also look to the principles of international comity to determine whether a stay is warranted.  *See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854–855 (2d Cir. 1997); *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985).  "Under the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States."  *Pravin*, 109 F.3d at 854.  However, "comity remains a rule of practice, convenience, and expediency rather than of law," and so "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States."  *Id.*; *see also Allied Bank Int'l*, 757 F.2d at 522 ("Acts of foreign governments purporting to have

extraterritorial effect—and consequently, by definition, falling outside the scope of the act of

state doctrine—should be recognized by the courts only if they are consistent with the law and

policy of the United States.").

A number of other district courts, including at least one court in this district, have denied

stays sought on similar grounds by Defendant or its state-owned enterprises.  *See, e.g.*, *Red Tree*

*Invs., LLC v. Petróleos De Venezuela, S.A.*, No. 19 Civ. 2523, 2020 WL 209276, at *3 (S.D.N.Y.

Jan. 14, 2020); *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51,

56 (D.D.C. 2019); *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 2019 WL

2185040, at *5.  Those courts that have entered stays have generally done so for a limited period

in order to allow Defendant or its state-owned enterprises to seek out evidence not readily under

their control.  *See, e.g.*, *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, No. 19 Civ. 2689, ECF

No. 32 (S.D.N.Y. Jul. 3, 2019).  *But see Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, 439 F.

Supp. 3d 270, 274 (S.D.N.Y. 2020) (granting summary judgment to plaintiffs after stay expired).[3]

The traditional factors governing the exercise of a district court's inherent authority to

stay a case counsel against a stay in these actions.  A stay that would last until the Guaidó

government takes power in Venezuela, stabilizes the country, and negotiates a debt restructuring

process amounts to an indefinite stay.  Such an open-ended pause of this litigation would

significantly prejudice Plaintiffs, particularly as cases against Defendant proceed in other courts.

*See State Farm Mut. Auto. Ins. Co. v. Mittal*, No. 16 Civ. 4948, 2018 WL 3127155, at *3

(E.D.N.Y. June 25, 2018) (denying stay where "there is no telling how long it would last" and

---

[3] Defendant places significant weight on the entry of a stay in *Crystallex International Corp. v. PDV Holding Inc.*, No. 15 Civ. 1082, 2019 WL 6785504 (D. Del. Dec. 12, 2019).  But that case concerns a stay pending appeal, which implicates different considerations than a stay prior to any decision on the merits.  Indeed, the *Crystallex* court entered a stay only after granting the plaintiffs' motion for attachment of the state-owned enterprise's assets.  2019 WL 6785504, at *1.

"the potential delay could be for years").  The Court recognizes that the significant burden on Defendant of litigating claims on its sovereign debt on a piecemeal basis may increase the challenge of setting up a restructuring process in the future.  Def. Mem. at 10–12.  But Plaintiffs' rights cannot be put on hold pending geopolitical developments that may or may not come to pass, and which courts are ill equipped to assess.  Likewise, with a dispositive motion for summary judgment ripe for determination, letting this action linger on the Court's docket for an unlimited period of time would not be an efficient use of judicial resources.

The public interest, which must take into consideration the principles of international comity and the policy of the United States, also does not favor a stay.  The issuance of the Renegotiation Guidelines by the Guaidó government is a governmental act entitled to respectful treatment.  *See Pravin Banker Assocs.*, 109 F.3d at 854 ("Peru's efforts to negotiate a settlement of its unpaid debt to foreign creditors are acts by a foreign government that have extraterritorial effect in the United States.").  But United States policy towards Defendant, as expressed in the regulations adopted by the Executive Branch, does not prevent litigation of existing claims.  On August 24, 2017, President Donald J. Trump issued Executive Order No. 13808, which bars "transactions related to, provision of financing for, and other dealings in . . . bonds issued by the Government of Venezuela."  82 Fed. Reg. 41,155, 41,155 (2017).  And on August 5, 2019, President Trump issued Executive Order No. 13884, which provides that "*all* property and interests in property of the Government of Venezuela that are in the United States . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  84 Fed. Reg. 38,843, 38,843 (2019) (emphasis added).  Applying that order's terms, the Treasury Department's Office of Foreign Assets Control ("OFAC") has issued regulations providing that "the entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award,

decree, or other order through execution, garnishment, or other judicial process purporting to

transfer or otherwise alter or affect property or interests in property blocked . . . is prohibited

unless authorized pursuant to a specific license issued by OFAC pursuant to this part."  31 C.F.R.

§ 591.407, but has also stated that "[a] specific license from OFAC is not ordinarily required to

initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to

OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case."

OFAC FAQ 808, *Frequently Asked Questions*, U.S. Dep't of the Treasury (Dec. 9, 2019),

https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/1581.  So, for example, a

party is prohibited from seizing, attaching, encumbering, or freezing such assets to enforce a

judgment, but not from legal actions that stop short of transferring control of property.  *Id.*

The Executive Branch and Congress have primacy in foreign relations, and if those

branches of government determine that preventing litigation against Defendant, or requiring

creditors to participate in a restructuring or centralized claims process, is appropriate, they have

the tools to do so.  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) ("[F]oreign

affairs [is] a domain in which the controlling role of the political branches is both necessary and

proper.").  But so far, the political branches have not determined that United States interests

require such a step.

The Second Circuit has cautioned courts against granting stays to foreign sovereign

litigants based on indeterminate debt restructuring proceedings in the face of "clear United States

policy" allowing creditors to recover on foreign debts.  *Pravin Banker Assocs.*, 109 F.3d at 855.

In *Pravin Banker Associates Ltd. v. Banco Popular de Peru*, the appeals court affirmed a district

court's denial of a stay requested to give the defendant, a Peruvian state-owned bank, time to

restructure its debts through a voluntary negotiation process.  *Id.* at 852.  Allowing a stay, the

court held, would make creditors' "rights conditional on the completion of a process which had

no obvious (and reasonably proximate) termination date" and "would have converted what the

United States intended to be voluntary and open-ended negotiations between Peru and its

creditors into the equivalent of a judicially-enforced bankruptcy proceeding, for it would, in

effect, have prohibited the exercise of legal rights outside of the negotiations." *Id.* at 855.  The

same considerations apply here.

Finally, principles of customary international law do not require a stay.  Defendants argue

that international law recognizes a defense of "necessity," which permits a state to defer its

international legal obligations to forestall a grave danger that threatens the existence of the state.

Def. Mem. at 19–22.  They also argue that it would be impossible for them to pay any judgment.

*Id.* at 22–23.  Even assuming such defenses are viable, and would apply to litigation of financial

obligations that are expressly subject to New York state law, they would not justify staying this

litigation.  To be sure, the dire political, economic, and humanitarian situation in Venezuela may

affect Defendant's ability to satisfy a judgment.  OFAC may wish to take that into account in

deciding whether to issue a license permitting Plaintiffs to pursue Defendant's property, and it

may be a good reason for Defendant's creditors to come to the negotiating table to discuss

restructuring.  But at this stage in these cases, conditions on the ground in Venezuela do not

require the Court to postpone the determination of the parties' rights and obligations.

Accordingly, Defendant's motion for a stay of proceedings is DENIED.

II.   Summary Judgment

"Summary judgment is appropriate only when the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Coyle*

*v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (internal quotation marks and citations

omitted).  The undisputed facts show that Plaintiffs are entitled to summary judgment on their claims.

      A.   Sovereign Immunity

Under the Foreign Sovereign Immunities Act (the "FSIA"), foreign states are immune from suit, but they can waive that immunity "either explicitly or by implication."  28 U.S.C. §§ 1604, 1605(a)(1).  In the fiscal agency agreements governing the bonds at issue in these actions, Defendant expressly waived its sovereign immunity.  *See* 1998 Fiscal Agency Agreement § 14; 2001 Fiscal Agency Agreement § 14.  Accordingly, the court has jurisdiction to consider Plaintiffs' claims.  *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 209 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014).

      B.   Liability

Plaintiffs, as beneficial owners authorized to bring suit by the registered holder of the 1998, 2001, and 2009 Bonds, have contractual standing to bring this suit.  *See Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005); *Etevob v. Republic of Argentina*, 471 F. Supp. 2d 432, 443 (S.D.N.Y. 2007) ("[A]n owner of a beneficial interest . . . must receive authorization from the registered holder of the bond before it may sue."), *aff'd sub nom. Mazzini v. Republic of Argentina*, 282 F. App'x 907 (2d Cir. 2008); 56.1 Stmt. ¶¶ 137–144.

The undisputed evidence shows that:

(1) On the 1998 Bonds, Defendant failed to make interest payments on February 15, 2018 and August 15, 2018, failed to pay the principal amount when the 1998 Bonds matured on August 15, 2018, and failed to make post-maturity interest payments on February 15, 2019 and August 15, 2019.  56.1 Stmt. ¶¶ 56–70.

(2) On the 2001 Bonds, Defendant failed to make interest payments on February 15, 2018 and August 15, 2018, failed to pay the principal amount when the 2001 Bonds matured on August 15, 2018, and failed to make post-maturity interest payments on February 15, 2019 and August 15, 2019.  *Id.* ¶¶ 71–100.

(3) On the 2009 Bonds, Defendant failed to make interest payments on October 13, 2017, April 13, 2018, October 13, 2018, April 13, 2019, and October 13, 2019, and failed to pay the principal amount when the 2009 Bonds matured on October 13, 2019.  *Id.* ¶¶ 101–136.

Defendant's failure to make payments required by the bonds' terms constitutes a breach of contract.  *See MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 517 (S.D.N.Y.) ("A bond is, of course, a contract, and the obligations and rights of the parties are thus defined by the terms of the bond."), *aff'd*, 719 F. App'x 47 (2d Cir. 2017); *Mun. Capital Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 390 (S.D.N.Y. 2002) ("Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach.").  And Defendant has not put forward any defense to liability on Plaintiffs' breach of contract claims.[4]

Accordingly, Plaintiffs are entitled to summary judgment on their breach of contract claims.

---

[4] In its reply, Defendant argues that Plaintiffs are required to seek OFAC licenses prior to the entry of judgment, because, they claim, Plaintiffs have argued that a favorable judgment in this case will relieve them from the provisions of the bonds that "allow a supermajority to bind nonconsenting creditors to the terms of restructured bonds."  Def. Reply. at 2, ECF No. 73 (quoting Pl. Reply at 5).  The Court does not agree.  The fact that Plaintiffs hope to secure a judgment before a potential restructuring alters their rights does not mean that a decision in their favor will result in a transfer of property covered by OFAC regulations.

C.  Damages

Plaintiffs seek $36,921,587.50 in damages to Casa Express, $217,380,625 in damages to Pharo Macro, and $136,380,625 in damages to Pharo Gaia, plus additional post-maturity interest payments required by the bonds between the date of Plaintiffs' motion and the date of judgment, pre-judgment interest, and attorney's fees.  Pl. Mem. at 18–19.  The undisputed evidence supports Plaintiffs' damages calculations, and Defendant does not contest them.  56.1 Stmt. ¶¶ 85, 100, 136; *see* Def. Mem. at 1–2.

Defendant does argue, however, that the Court should not award prejudgment interest. Def. Mem. at 23–27.  Under New York law, prejudgment interest on missed principal payments is governed by the contract's terms, but a plaintiff is also entitled to prejudgment interest at a 9% statutory rate on any interest payments required by the contract that the defendant has failed to make—sometimes referred to as "interest on interest."  *See NML Capital v. Republic of Argentina*, 435 F. App'x 41, 43 (2d Cir. 2011) ("[P]laintiffs were entitled to statutory pre-judgment interest on post-maturity and post-acceleration contract interest payments from the date those payments became due.") (citing *NML Capital v. Republic of Argentina*, 952 N.E. 482, 494–95 (N.Y. 2011)); N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.").

Defendant claims that New York law does not apply to the calculation of prejudgment interest in this action, because the Court's jurisdiction in a case against a foreign sovereign is founded on federal law.  Def. Mem. at 23–27.  Although the Court has jurisdiction over this action pursuant to the FSIA, the substantive law governing Plaintiffs' claims is the law of New York.  *See* Fiscal Agency Agreement § 12; 2001 Fiscal Agency Agreement § 12; *see also* 28 U.S.C. § 1606 ("As to any claim for relief with respect to which a foreign state is not entitled to

immunity . . . the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.").[5]  "[T]he applicability of state law depends on the nature of the issue before the federal court and not on the basis for its jurisdiction."  *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 692 n.13 (2d Cir. 1983).  Thus, New York law governs the award and calculation of prejudgment interest on Plaintiff's claims.  *See NML Capital v. Republic of Argentina*, 621 F.3d 230, 239 (2d Cir. 2010) (holding that New York law governed award of prejudgment interest on breach of contract claim against foreign sovereign based on missed bond payments).

"Under New York C.P.L.R. § 5001, a creditor is entitled to prejudgment interest on all sums due, as of the date they became due."  *Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 296 (2d Cir. 2009) (citing *Spodek v. Park Prop. Dev. Assocs.*, 759 N.E.2d 760, 762 (N.Y. 2001)).  "While awards of interest are generally discretionary, New York law does not permit the trial court to exercise any discretion where a party is entitled to prejudgment interest as a matter of right."  *Id.* (internal quotation marks, citation, and alterations omitted); *see* N.Y. C.P.L.R. 5001 ("Interest *shall be recovered* upon a sum awarded because of a breach of performance of a contract." (emphasis added)).

Accordingly, the Court holds that a 9% rate of prejudgment interest applies to each of Defendant's missed interest payments, running from the date that those payments should have been made until the date of judgment.  The Court further finds that Casa Express is entitled to $36,921,587.50 in damages, Pharo Macro to $217,380,625 in damages, and Pharo Gaia to $136,380,625 in damages, plus the value of any additional unmade post-maturity interest payments between the date of Plaintiffs' summary judgment motion and the date of judgment.

---

[5] Indeed, the House Report on the FSIA specifically contemplated that the statute would allow for the award of "interest prior to judgment," reasoning that "[i]f a foreign state is not immune from suit, it should be liable for interest to the same extent as a private party."  H.R. REP. 94-1487, at 10 (1976).

### D.  Fraud and Error Prevention Mechanisms

Lastly, Defendant asks that the Court create a "mechanism to prevent error or fraud that could otherwise arise" if Plaintiffs transfer their beneficial interests in the bonds to another party after obtaining a judgment in this action.  Def. Mem. at 27–29.  Defendant has not presented any authority for establishing such a mechanism as a condition of granting judgment to Plaintiffs, or any reason to believe that Plaintiffs will engage in such conduct.  These concerns may be addressed in the future by the federal securities laws, courts' inherent power to punish fraud on the court, and the rules of any restructuring process eventually established by Defendant. Accordingly, the Court declines to impose restrictions on Plaintiffs as a condition of entering judgment now.

## CONCLUSION

For the reasons stated, Defendant's motion for a stay is DENIED, and Plaintiffs' motion for summary judgment is GRANTED.

It is ORDERED that by **October 7, 2020**, Plaintiffs shall submit proposed judgments consistent with this order.

It is further ORDERED that by **October 30, 2020,** Plaintiffs shall submit their motions for attorney's fees.  By **November 30, 2020**, Defendant shall file its opposition to each motion.

The Clerk of Court is directed to terminate the motions at ECF Nos. 59 and 65 in case number 18 Civ. 11940, and the motions at ECF Nos. 37 and 43 in case number 19 Civ. 3123.

SO ORDERED.

Dated: September 30, 2020
       New York, New York

_____
         ANALISA TORRES
       United States District Judge

15